UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAYLEY MOORE,<br>    Plaintiff,<br>    v.<br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br>    Defendant. | Case No. 15-cv-05779-RS<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

## I. INTRODUCTION

In October 2014, plaintiff Hayley Moore, a student at the University of California, Santa Barbara ("UCSB"), left her dormitory to attend a party in the nearby neighborhood of Isla Vista. That night, another student allegedly gave Moore a narcotic to render her unconscious, and then dragged her to his apartment where, tragically, he proceeded to assault her sexually. She awoke the next morning on the side of a road and then made her way to the dormitory, where she immediately informed family and university officials of the events of the prior evening. The nightmare didn't end there, according to Moore, because the university subsequently failed to take steps to remediate her hostile campus environment or provide her with accommodations. She now brings suit against The Regents of the University of California ("Regents" or "university") alleging discrimination on the basis of gender in violation of 20 U.S.C. § 1681 *et seq.* ("Title IX"). The university moves to dismiss on the ground its response did not violate Title IX.

For the reasons explained below, the motion to dismiss will be granted with leave to amend. Moore has not pleaded adequately deliberate indifference based on the university's pre- or post-assault conduct.

## II. FACTUAL BACKGROUND[1]

In October 2014, plaintiff Hayley Moore, a student at UCSB, attended a party at a nearby apartment in the Isla Vista neighborhood of Santa Barbara. During the festivity, Moore believes John Doe—another student at UCSB—gave her a narcotic to render her unconscious and then dragged her from the party to his apartment. Tragically, Moore avers Doe sexually assaulted her sometime that evening, and she ultimately regained consciousness only the next morning on a roadside in Isla Vista.

Moore returned to her dormitory and phoned her cousin to tell her about the events of the evening, and Moore's cousin promptly called the police to report the sexual assault. A University of California Police Department ("UCPD") detective arrived shortly thereafter and took Moore back to the police station where he proceeded to take Moore's statement. Upon returning to her dormitory, Moore reported her assault to Tracy Mcalpin, her Resident Hall Advisor. McAlpin, in turn, reported Moore's assault to Morgan Vinson, the Assistant Resident Director. Mcalpin then phoned Emily Crutcher, a Campus Advocacy Resources & Education ("CARE") advocate, who came to Moore's room that same day to discuss with her what had happened.

The next day, Moore went to UCSB's counseling center and was assigned to see an intern, who scheduled an appointment seven to ten days in the future. Distressed by that outcome, Moore's father contacted Marisa Huston, UCSB's Assistant Coordinator of Student Mental Health Services. He told her he wanted his daughter to be seen by a clinician with more experience, and

---

[1] The factual background is based on the averments in the complaint, which must be taken as true for purposes of a motion to dismiss. Additionally, the Regents request notice of the sexual assault policies in force at the time of Moore's assault, and a February 17, 2016, letter from the Office of Civil Rights at the U.S. Department of Education ("DOE"). *See* Def.'s Request for Judicial Notice ("RJN") Exs. 1, 2. The sexual assault policies are incorporated by reference in the complaint, *see, e.g.*, FAC ¶ 32, and therefore may be considered to resolve the motion to dismiss. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). The request is granted as to the OCR letter as it is a record from a government website whose authenticity cannot reasonably be questioned. *See Paralyzed Veterans of Am. v. McPherson*, No. C 06–4670 SBA, 2008 WL 4183981, at *17–18 (N.D. Cal. Sept. 9, 2008). For this same reason, Moore's request for notice of DOE's April 4, 2011, Dear Colleague Letter ("DCL"), and DOE's Questions and Answers on Title IX and Sexual Violence, will be granted. *See* Pl.'s RJN Exs. A, B.

1    much sooner than the then scheduled appointment.  Huston assured him she would find a more

2    qualified practitioner to meet with Moore, and also would arrange for the meeting to take place on

3    a date sooner than the previous appointment.

4        True to her word, Huston herself met with Moore two to three days later, but when Moore

5    arrived at the meeting, Huston told her she could spare a mere ten minutes.  Huston added at the

6    outset that she was not obligated to keep their conversation confidential.  Moore proceeded to

7    inform her she was having significant difficulty in her classes due to the assault.  Moore said her

8    human sexuality class was "very triggering," and she could not concentrate enough to do the work

9    for her statistics class.  Huston advised Moore to work with her CARE advocate (Crutcher) to

10   rearrange her class units.  Moore responded she was concerned that doing so could jeopardize the

11   financial aid she received, and her ability to live in UCSB dormitories, assuming she dropped

12   below a certain number of units.  Huston agreed those issues could be a problem, but then ended

13   the meeting.

14       Three or four days later, Moore received a telephone call from Kirsten Olsen, UCSB's

15   Assistant Clinical Director and Crisis and Administrative Services Coordinator.  Olson insisted

16   Moore meet with her, and they met a few days later.  Olson started the meeting by talking about

17   grades and asked if Moore had considered withdrawing from the university.  When Moore

18   indicated she did not wish to withdraw, Olsen questioned that decision, saying there were

19   counseling measures she could use during the time she was withdrawn.  Moving on, Moore

20   requested assistance with setting an appointment to meet with a psychiatrist, and Olson set up

21   another time to meet with Moore at the conclusion of the meeting.  Moore later called Olson to

22   reschedule that meeting because she had decided to go home for a few days.  Olson agreed to

23   reschedule, but raised the effect Moore's decision to go home would have on her grades.

24       A few days later, Moore spoke on the telphone with Joe O'Brien, UCSB's Assistant Dean

25   and Director of Advising.  They discussed Moore's concerns about financial aid and her ability to

26   live in the dormitories.  Sometime prior to the call, Moore's mother informed O'Brien of Moore's

27   assault.  O'Brien confirmed that if Moore reduced her course load she would be ineligible for

28

United States District Court
Northern District of California

financial aid, and also ineligible to continue living in UCSB dormitories. O'Brien, however, also mentioned Moore could appeal to two separate offices to maintain her financial aid and her ability to live in the on-campus dormitories.

In early November 2014, Moore met a second time with Olson, who again warned that her grades likely would suffer if she went home for an extended period. Moore relayed her frustration with the progress of the police investigation into her assault. Olson countered: "I think you need to realize the reality of the situation here. Girls come in here with bruises and bloody faces and even their cases don't get prosecuted." Compl. ¶ 61. When Olson then told Moore the earliest date she could see a psychiatrist was December 6, 2014, Moore responded she was unhappy with the treatment she had been receiving from Olson. Moore requested a new counselor, Cali Lantrip, but Olson said Lantrip's schedule was packed and encouraged Moore to continue receiving treatment from Olson. Moore then told her CARE advocate, Crutcher, she no longer wanted to be treated by Olson, and instead wanted to begin undergoing treatment with Lantrip. Crutcher was able to schedule Moore to see Lantrip within a few days.

Lantrip ran the group counseling sessions for sexual assault survivors, and Moore told Lantrip she desired to attend one of the counseling sessions. Lantrip responded the sessions were full at that time, but Moore certainly could shoot for attending a group session during the spring semester.

Moore avers she constantly feared for her safety due to the school's failure to provide accommodations, and at least one time during the semester, she saw John Doe on campus. The sighting induced a panic attack and she quickly left the area. She now believes Doe's unrestricted presence exposed her to a sexually hostile environment. At the time, her fear and anxiety caused her to avoid various parts of campus, and all social activities that took place on campus or that were sponsored by UCSB.

Moore asserts when she expressed her desire to various administrators that remedial action be taken, they said "the school could conduct an investigation, but it would take a long time, be difficult emotionally, and distract Moore from her studies." Compl. ¶ 72. They also said sexual

assault investigations often boil down to "he said, she said" scenarios, and rarely resolve in favor of the victim. Finally, Moore was told if she initiated a school investigation, "it would likely interfere with, and possibly even sabotage, the criminal investigation of Moore's assault." *Id.* Moore eventually indicated she did not want to pursue an investigation, and believes the university did not take any action to investigate her sexual assault.

In January 2015, Moore was informed she had been placed on academic probation. Later that month, she withdrew from the university. She explains she was frustrated with UCSB's response to her complaint, and the hostile environment the campus had become given her fear of encountering her assailant. She avers she was deprived of educational opportunities and various benefits, as the school's treatment caused a drop in her GPA, withdrawal from several classes, avoidance of on-campus social activities, the need to seek accommodations, and her eventual withdrawal.

This is perhaps unsurprising, according to Moore, because in September 2014, six UCSB students filed a complaint with the Office of Civil Rights ("OCR") at the U.S. Department of Education ("DOE"), alleging violations of Title IX in the way the university responded to their sexual assaults. In April 2015, moreover, students protested UCSB's failure to adhere to federal and internal sexual assault policies, and demanded the university change its procedures for responding to reports of sexual assault. In direct response to this outrage, Moore avers UCSB adopted guidelines set forth by the OCR in two "significant guidance documents": (1) a Dear Colleague Letter ("DCL") issued by DOE on April 4, 2011, and (2) DOE's Questions and Answers on Title IX and Sexual Violence ("Q&As"), issued April 29, 2014.[2]

Moore commenced this action on December 17, 2015, alleging a single claim for violation of Title IX prior to and following her reported sexual assault. *See* 20 U.S.C. § 1681 *et seq.* The

---

[2] Significant guidance documents, as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, "do[] not add requirements to applicable law, but provide[] information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations." DCL at 1 n.1. *See also* 72 Fed. Reg. 3432 (Jan. 25, 2007).

Regents moved to dismiss on January 27, 2016, arguing there is no private right of action for regulatory enforcement, the university did not act with deliberate indifference, and any deliberate indifference did not cause Moore to undergo harassment. Moore elected to file a First Amended Complaint ("FAC") on February 10, 2016, and the Regents moved to dismiss a second time shortly thereafter.

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id*. at 679.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true).


# IV. DISCUSSION

Moore asserts a single claim for a violation of Title IX based on the university's actions both prior to and following her alleged sexual assault. Title IX provides "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

A university can be held liable for violating Title IX in connection with peer-on-peer harassment only in "limited circumstances," where five requirements are met. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). First, a school is liable "only for its own misconduct," *id.* at 640, so the institution must "exercise[] substantial control over both the harasser and the context in which the known harassment occurs," *id.* at 645. Second, the survivor must have suffered harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Third, the institution must have had "actual knowledge" of the harassment. *Id.* at 650. Fourth, the institution must have acted with "deliberate indifference" to the known harassment. *Id.* at 651. Fifth, this deliberate indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645.

The Regents assert only that Moore has not pleaded adequately "deliberate indifference."[3] Before turning to that inquiry, three preliminary issues must be dispatched.

## A. Preliminary Issues

First, Moore contends as a threshold matter the motion to dismiss should be denied because deliberate indifference is a question of fact not suited for determination at this juncture. The Supreme Court's decision in *Davis* belies that assertion explicitly. In *Davis*, the Court explained "funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly

---

[3] The FAC evinces the other elements adequately have been pleaded.

unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. It continued "there is no reason why courts, *on a motion to dismiss*, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649. Accordingly, the Regents are not barred from demonstrating a lack of deliberate indifference by means of this motion to dismiss. Moreover, Moore, like all plaintiffs, must plead sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Next, Moore variously suggests her claim arises from OCR's guidance documents; specifically, the requirements articulated in the DCL and the Q&As. *See, e.g.*, Compl. ¶ 77 ("Defendant violated the standards set forth by the DCL, Questions and Answers, and Defendant's own policies."); *id.* ¶ 82 ("Defendant Trustees acted with deliberate indifference in deviating significantly from the standard of care outlined by the DOE in the DCL of 2011."); Opp'n at 8:13–15 ("[T]his court should . . . accept that a reasonable jury could find deliberate indifference in an educational institution's departure from these stated policies and procedures."). This is not correct. There is no private right of action to recover damages under Title IX for violations of DOE's administrative requirements, much less the provisions of the DCL and Q&As, which are agency guidance documents. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291, 292 (1998). Further, the DCL itself explicitly provides "the standard for administrative enforcement of Title IX[,] and in court cases where plaintiffs are seeking injunctive relief." DCL at 4 n.12. "The standard in private lawsuits for monetary damages," the DCL explains, "is actual knowledge and deliberate indifference," as established in *Davis*. *Id.* The DOE agrees, as detailed in the letter from OCR to Senator James Lankford, dated February 17, 2016. It explains "OCR issues guidance documents—including interpretative rules, general statements of policy, and rules of agency organization," but "[t]he Department does not view such guidance to have the force and effect of law." Def.'s RJN Ex. 2.

Lastly, Moore submits it is appropriate to defer to DOE's administrative requirements when deciding whether the university's actions amount to deliberate indifference. This

suggestion, too, like those before it, simply is misguided, notwithstanding Moore's invocation of *Chevron* and *Barnhart* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Barnhart v. Walton*, 535 U.S. 212 (2002). When it comes to private suits alleging liability in damages under Title IX for peer-on-peer harassment, an institution's "alleged failure to comply with the regulations . . . does not establish the requisite actual notice and deliberate indifference."[4] *Gebser*, 524 U.S. at 291–92. After all, the administrative scope of liability is different than the scope articulated in *Davis*, in connection with private claims under Title IX for money damages. *Compare* DCL at 4 (imposing liability "[i]f a school knows or reasonably should know about student-on-student harassment that creates a hostile environment"), *with Davis*, 526 U.S. at 650 (imposing liability "only where [institutions] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."). All told, in deciding if Moore adequately has pleaded deliberate indifference, *Davis* and its progeny—not the DCL and Q&As—must govern. *See Karasek v. Regents of the Univ. of Cal.*, No. 15-cv-03717-WHO, 2015 WL 8527338, at *13–14 (N.D. Cal. Dec. 11, 2015).

**B. Deliberate Indifference**

Institutions "are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Institutions are not required to "purg[e] their school[] of actionable peer harassment," nor do "victims of peer harassment . . . have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648. Instead, the standard is akin to "an official decision by the [institution] not to remedy the violation." *Gebser*,

---

[4] Of course, "the Department of Education could enforce the requirement[s] administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, even if those requirements do not purport to represent a definition of discrimination under the statute." *Gebser*, 524 U.S. at 292 (internal citation omitted).

524 U.S. at 290.

### 1. Post-Assault Conduct

Moore contends the school's response to known harassment was "clearly unreasonable" in two ways.  First, after learning of the assault, UCSB allegedly failed to initiate a grievance procedure within a reasonable amount of time.  Moore notes she expressed her desire to administrators that remedial action be taken, to which they countered "the school could conduct an investigation, but it would take a long time, be difficult emotionally, and distract Moore from her studies." Compl. ¶ 72.  They also said sexual assault investigations often boil down to "he said, she said" scenarios, and rarely resolve in favor of the victim.  Finally, Moore was told a school investigation "would likely interfere with, and possibly even sabotage, the criminal investigation of Moore's assault." *Id.*  Moore admits she later indicated she did not wish to pursue an investigation, and avers the university did not take any action to investigate her sexual assault.

Moore invokes *Williams v. Board of Regents of the University System of Georgia.*, 477 F.3d 1282 (11th Cir. 2007), in support of her claim.  There, the school had a preliminary report within forty-eight hours of a sexual assault, but waited another eight months before conducting a hearing to decide whether to sanction the alleged assailants. *Id.* at 1296.  The court concluded the university acted with deliberate indifference in responding to the assault. *Id.*

The university, for its part, relies on *Oden v. Northern Marianas College*, 440 F.3d 1085 (9th Cir. 2006), to contend the FAC does not allege conduct amounting to a sufficient delay.  In *Oden*, the plaintiff alleged her college deliberately was indifferent to her allegations of sexual harassment because there was "a nine-month delay" in convening a hearing on the incident. *Id.* at 1089.  The Ninth Circuit found the delay was not more than "negligent, lazy, or careless," given the plaintiff had left the area for some time-period and the college believed she was looking for a lawyer. *Id.* The court ultimately concluded the plaintiff had not met the high standard for deliberate indifference. *Id.*

Moore is correct a delay may in some instances constitute deliberate indifference.  That said, given the three-month timeline governing Moore's allegations, and the renunciation of her

wish for an investigation, Moore has not pleaded delay that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Setting aside the comparatively brief window, Moore insists she did not contribute to any delay, but she avers she went "home for a few days" and eventually withdrew her request to investigate her assault. Compl. ¶¶ 58, 72. Further, she avers the university believed a school investigation "would likely interfere with" the criminal investigation, yet even if it was wrong, that mistake likely does not rise above negligence, as in *Oden*. In short, crediting Moore's allegations that the university discouraged her from pursuing an investigation, the FAC still does not adequately plead deliberate indifference based on investigative delay.

Second, Moore contends the university's response to her assault was "clearly unreasonable" because it failed to take steps to remediate the hostile environment or provide her with accommodations. Moore leans on *Kelly v. Yale University*, No. Civ.A. 3:01–CV–1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003), to support both prongs of this argument. In *Kelly*, the plaintiff was sexually assaulted by a student with whom she shared a class and who also lived in her dormitory. *Id.* at *1–2. She filed a complaint immediately with the appropriate committee indicating the assault had created a hostile environment and requesting remedial action. *Id.* at *1. The school's grievance procedures kicked into gear and within two months the assailant was required to take a leave of absence until the plaintiff had graduated. *Id.* Throughout those two months, the plaintiff repeatedly requested academic accommodations, but the university "never responded to her repeated entreaties." *Id.* at *2. Likewise, she indicated she no longer felt safe in the dormitory and requested alternative accommodations, but her plea fell on deaf ears until a university professor intervened on her behalf. *Id.* at *2. Evaluating her Title IX claim, the court found she alleged deliberate indifference because "Yale's failure to provide Kelly with accommodations, either academic or residential, *immediately* following [the assailant's] assault of her, was clearly unreasonable given all the circumstances of which it was aware." *Id.* at *4 (emphasis added).

Building from this foundation, Moore argues the university "had a responsibility to

remediate [her] hostile environment expeditiously." Opp'n at 10:17–18. She avers she "was in constant fear for her safety" and "greatly feared running into her assailant," Compl. ¶ 73, but the university "did not take any action to investigate," Compl. ¶ 71, and "failed to provide any interim measures . . . to better ensure her protection," *id.* ¶ 73.

In a similar vein, Moore argues the university deliberately was indifferent because it failed to provide her with accommodations related to her course load and housing following the assault. Moore indicates she expressed her concern to administrators that dropping units could jeopardize her financial aid, as well as her ability to live in UCSB dormitories. Huston, a school official, agreed those issues could be a problem, but then apparently elected to end the meeting.[5]

All told, Title IX requires the university to make an effort to remedy known harassment in a manner not "clearly unreasonable." Taking the above topics in turn, Moore contends "[t]he mere presence on campus, without any restrictions, of the student that sexually assaulted [her]" placed her in a sexually hostile environment, and the university did nothing whatsoever. At best, the university sought to remedy the hostile environment by advising Moore to withdraw, and "questioning" her refusal to act otherwise.[6] Compl. ¶ 57. Moore did not make any particular remedial demand, and appears mindful of the due process rights of the accused, but implies an administrator who was not "clearly unreasonable" would have done *something* to help ensure her protection. Unlike *Kelly*, however, Moore does not aver the school ignored or rebuffed her requests for accommodations that specifically would have helped ameliorate the hostile environment to which she had been exposed. Nor does she aver explicitly she informed university officials she feared for her safety on campus, though the university likely surmised as much given the alleged assailant was a UCSB student. Moore does allege she eventually saw John Doe on

---

[5] Moore concedes O'Brien later told her if she elected to reduce her course load, she could appeal to two separate offices to keep her financial aid and her ability to live in the on-campus dormitories.

[6] At oral argument, the Regents' counsel indicated the remedial step of offering an opportunity temporarily to withdraw would have involved a refund of Moore's tuition.

campus later in the semester, but does not aver she ever reported that incident to anyone in particular. At bottom, with respect to remediating the hostile environment, the university's conduct certainly appears "negligent, lazy, or careless," but does not quite rise to the standard of "clearly unreasonable" at the present juncture.[7]

Similarly, Moore's effort to demonstrate the school failed to provide reasonable accommodations falls just short. According to the FAC, within one day of the incident, a university police officer and CARE advocate separately met with Moore. Within two days, Moore met with a counselor provided by the university. Within one week, Moore met with a new counselor, who referred her to another CARE advocate. Within two weeks, Moore met with the Assistant Clinical Director, and shortly thereafter, the Assistant Dean and Director of Advising. Moore not only received counseling throughout these various meetings, but learned about a process that could permit her to keep her financial aid and housing if she dropped units. These academic and housing requests were not simply ignored, as they were in *Kelly*, but the FAC does suggest the university elected to leave the ball wholly in Moore's court. Once again, that decision appears "negligent, lazy, or careless," but as presently pleaded, does not evince conduct plainly unreasonable in light of the known circumstances. In sum, to the extent Moore's claim is based on the university's response to her sexual assault, the motion to dismiss will be granted, but with leave to amend.

**2. Pre-Assault Conduct**

Moore also contends she adequately has pleaded a claim against the university based on its pre-assault response to the general problem of sexual violence on its campus. Moore seeks to establish liability in two ways. First, she asserts UCSB's procedures for responding to sexual assault when she attended the university were in violation of Title IX. She says the school failed

---

[7] Notably, in *Oden*, the plaintiff alleged deliberate indifference on a similar theory, pointing out she twice crossed paths with her alleged assailant on campus, notwithstanding a no-contact order. *See Oden*, 440 F.3d at 1087, 1089. The Ninth Circuit declined to find deliberate indifference as to the plaintiff's theory that the school failed to remediate the hostile on-campus environment. *Id.* at 1089.

to publish a notice of nondiscrimination, contact information for a Title IX coordinator, and grievance procedures that align with prompt and equitable resolution of complaints. These requirements are drawn from DOE regulations, but as noted above, there is no private right of action to recover damages under Title IX for violations of DOE's administrative requirements. *Gebser*, 524 U.S. at 291–92 (noting institution's "alleged failure to comply with the regulations, however, does not establish the requisite actual notice and deliberate indifference. And in any event, the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX."). This attempt to impose liability for pre-assault conduct therefore falls flat.

Alternatively, Moore points to her allegations that (1) six UCSB students filed a complaint with OCR alleging violations of Title IX in the way the university responded to their sexual assaults, (2) several students protested UCSB's failure to adhere both to federal and internal sexual assault policies, and demanded the university change its procedures for responding to reports of sexual assault, and (3) UCSB adopted guidelines set forth by OCR as a direct result of the campus activity. In Moore's eyes, the inference to be drawn is that UCSB intentionally was violating Title IX because it knew of harassment, knew its policies were inadequate, and only changed them after significant pressure. Moore submits she has thus met the deliberate indifference element of her Title IX claim, and she subsequently experienced harassment as an outgrowth of the university's intentional failure to act.

Though a school's inadequate response to a known institutional problem of sexual violence may support a student-on-student harassment claim, Moore has not pleaded adequately deliberate indifference based on the university's pre-assault conduct. *Williams* and *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), are instructive on this point. In *Williams*, the school had knowledge of an athlete's prior sexual misconduct yet elected to recruit him through a special process, and then failed to supervise him. 477 F.3d at 1296. This athlete later sexually assaulted the plaintiff, and the court accordingly found the school's conduct evinced deliberate indifference, which led to the plaintiff's harassment. *Id.* Likewise, in *Simpson*, the school had prior knowledge of a heightened risk of sexual assault in connection with its football recruiting, yet it

failed to supervise that specific process despite knowing this would encourage sexual harassment. *See Simpson*, 500 F.3d at 1181–85.  The court ultimately found a jury could find the university deliberately indifferent to a known problem of harassment. *Id.* at 1184–85.

Here, Moore does not allege the university had any specific knowledge of a heightened risk of sexual assault either by John Doe or in the particular context in which the assault occurred. Instead, Moore relies on general allegations regarding the university's inadequate response to sexual violence, and various protest efforts she deems responsible for the adoption of new sexual assault policies.  The university's level of awareness, as reflected in the FAC, simply is not enough to support a finding of deliberate indifference to known harassment. *See Karasek*, 2015 WL 8527338, at *10.  Accordingly, to the extent Moore's claim is based on the school's pre-assault conduct, the motion to dismiss will be granted, but with leave to amend.

## V. CONCLUSION

Moore has not pleaded adequately deliberate indifference based on the university's pre- or post-assault conduct.  As such, the motion to dismiss will be granted, but with leave to amend. Should Moore elect to amend her pleading, she must lodge an amended complaint within thirty (30) days from the date of this order.

**IT IS SO ORDERED**.

Dated: May 23, 2016

_____
RICHARD SEEBORG
United States District Judge